CREDIT & INVESTMENT CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 105528.   Promulgated September 15, 1942.

*Charles C. Parlin, Esq.,* and *Samuel A. McCain, Esq.,* for the petitioner.

*Charles Oliphant, Esq.,* for the respondent.

## OPINION.

MELLOTT: Petitioner contends that its basis for the computation of gain or loss upon the sale, in the taxable year,[1] of the German securities purchased by it in 1935[1] upon the Bourse, was $145,408.98. This amount is the allocable portion of the sum originally invested by it in the Ostdeutsch bond. Respondent determined that the basis is the cost of the securities purchased in 1935 ($51,842.92), which is equivalent to the quoted price of "blocked" marks ($0.1437) on the New York market at the time the purchase was made and which he determined was the fair market value of the 360,771.89 marks used in the acquisition of the securities.

Upon brief petitioner divides its arguments into four parts, some of its contentions being in the alternative. They will be discussed in the order presented.

Petitioner's first contention is that the provisions of the Revenue Act of 1934 relating to involuntary conversions (section 112 (f)) are applicable and that its basis should be determined under section 113

---

[1] The record indicates that the sales in the taxable year ended January 31, 1937, all occurred in the year 1936 and that the purchases were made upon the Bourse during 1935. In this opinion, therefore, the date of purchase will be referred to as 1935 and the date of sale as 1936.

(a) (9) of the Revenue Act of 1936. The sections relied upon are shown in the margin.[2]

The substance of petitioner's argument is that the German law of June 9, 1933, was, for all practical purposes, "a condemnation of all foreign exchange or rights to foreign exchange"; that its receipt of marks instead of dollars "was in both form and substance an involuntary conversion within the terms of section 112 (f)"; that the German securities purchased by it in 1935 were "similar or related in service or use" to the Ostdeutsch bond; and that they collectively had its basis.

Respondent denies that the sections relied upon are applicable. He argues that petitioner had an obligation which matured and which, pursuant to restrictive regulations of the German Government, was paid in reichsmarks at the prevailing rate of exchange; that the fact it was paid in reichsmarks instead of dollars is relevant only in determining the amount of loss sustained, or, possibly, in determining whether there was a closed transaction; that the reichsmarks were convertible into dollars (albeit at a discount) and had a fair market value of $0.1437 when received; and that the transaction was complete, for tax purposes, when the bond was sold. He also contends that petitioner has failed to show that the property purchased in 1935 was "similar or related in service or use" to the Ostdeutsch bond, as construed by him in article 112 (f)—1 of Regulations 86,[3] since the bond was a secured obligation while the securities purchased were "capital stock of other corporations."

---

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

* * * * * * *

(f) INVOLUNTARY CONVERSIONS.—If property (as a result of its destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof) is compulsorily or involuntarily converted into property similar or related in service or use to the property so converted, or into money which is forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted, or in the acquisition of control of a corporation owning such other property, or in the establishment of a replacement fund, no gain or loss shall be recognized. If any part of the money is not so expended, the gain, if any, shall be recognized, but in an amount not in excess of the money which is not so expended.

SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—

* * * * * * *

(9) INVOLUNTARY CONVERSION.—If the property was acquired, after February 28, 1913, as the result of a compulsory or involuntary conversion described in section 112 (f), the basis shall be the same as in the case of the property so converted, decreased in the amount of any money received by the taxpayer which was not expended in accordance with the provisions of law (applicable to the year in which such conversion was made) determining the taxable status of the gain or loss upon such conversion, and increased in the amount of gain or decreased in the amount of loss to the taxpayer recognized upon such conversion under the law applicable to the year in which such conversion was made.

[3] In the regulation it is stated: "* * * The benefits of section 112 (f) cannot be extended to a taxpayer who does not purchase other property similar or related in service or use, notwithstanding the fact that there was no other such property available for purchase."

The respondent's determination should not, in our judgment, be overthrown upon the ground suggested. Only by a strained construction of its language could section 112 (f) be held to be applicable. Inferentially petitioner admits as much when it is compelled to resort to the fiction that the German Government condemned its property. "An exercise of the power of \* \* \* condemnation", as used in the statute, has always, so far as we have been able to ascertain, been construed to refer to the taking of private property for public use, i. e., to the taking of private property through the exercise of the power of eminent domain.

The German law, set out in part in our findings but shown at length in the evidence, did not attempt to make any condemnation of foreign exchange or rights to foreign exchange. It provided that in case a debtor was required to pay his obligation in foreign currency the amount should be converted into reichsmarks "at the official Berlin middle rate of the currency in question on the working-day preceding the date of payment." After the enactment of that law petitioner had no method of enforcing payment in dollars of the obligations held by it. Cf. *Perry* v. *United States*, 294 U. S. 330. But it could enforce payment in reichsmarks and payment was made. True, the reichsmarks were kreditsperrmarks, or "blocked credit marks", which could be transferred to third parties only with governmental approval or sold to Deutsche Golddiskontbank against foreign exchange. While blocked credit marks were worth less than free marks, they were not without fair market value, as is indicated by the fact that they were quoted on the New York market at $0.1437. They could be used in Germany for many purposes, some uses requiring special permission of the German Government and others requiring no permission. One of the latter was selected by petitioner. As we view the stipulated facts there was no involuntary conversion of petitioner's property in 1935, but a mere reinvestment in German securities of the amount received in payment of a bond which it owned.

If we have erred in holding, as we do, that the involuntary provisions of the statute are not applicable, still we think petitioner can not prevail upon the theory advanced because of its failure to show that the securities purchased in 1935 were "similar or related in service or use" to the Ostdeutsch bond. The bond was a secured obligation—"issued under and secured by an indenture"—while the securities, for aught appearing in the stipulated facts, may have been capital stock. It is unnecessary to dwell at length upon the difference between bonds and stock. In the former the relation of debtor and creditor exists, while in the latter capital is subjected to the ordinary risks of a corporate business. Cases cited by petitioner construing the expression "like kind or use" appearing in section 202 (c) (1) of the Revenue Act of 1921 are not pertinent.

Another circumstance militating against petitioner's contention that its property was "compulsorily or involuntarily converted into property similar or related in service or use" is the fact that during 1935 it was able to take out of Germany more than $115,000. This is some indication that the investment of the amount received from the Ostdeutsch bond in German securities was voluntary, notwithstanding the testimony of petitioner's witness to the effect that it was the policy of the company to get all of its money out of Germany at the earliest possible date. In any event, since the evidence does not prove that petitioner attempted to secure permission to transfer the amount in issue for the purpose of sale outside of Germany and was unable to do so, no compulsion has been shown.

Petitioner's second contention is, that if cost is the basis for computing its gain or loss upon the securities, then the value of the marks used in computing such cost was $0.40. This was the official German rate of exchange applicable to free marks. Respondent determined that the cost of the securities was the fair market value of the marks used in their purchase, or $0.1437 per mark, which was the price at which blocked credit marks were quoted on the market in New York at the time the purchase was made.

Ordinarily the cost of property purchased with foreign exchange is determined by reducing the foreign currency to dollars at the rate of exchange prevailing on the date of purchase. *Bernuth Lembcke Co.*, 1 B. T. A. 1051; *Joyce-Koebel Co.*, 6 B. T. A. 403; *James A. Wheatley*, 8 B. T. A. 1246. If the purchase were made with free marks, then petitioner's present contention should be upheld; for it has been stipulated that "the official Berlin rate was at about 40 cents per mark." The question therefore is: Were the marks "free" or "blocked"?

The fact that the marks could be used for certain purposes within Germany without permission of the German Government did not, in our opinion, make them free marks. They were blocked marks when received and upon sale of the securities in which they were invested the proceeds again became blocked marks. If they had been transferred outside of Germany in 1935 petitioner could have received $0.1437 per mark. As pointed out above, petitioner took out of Germany at about the same time more than $115,000 on that basis. Instead of taking out the 360,771.89 blocked marks remaining to its credit from the sale of the Ostdeutsch bond petitioner invested them in securities which it sold later for 377,891 blocked marks. On the face of the transaction it made a profit of 17,119.11 blocked marks. Respondent has not attempted to tax it upon this paper profit, but has recognized that the purchase and sale of securities in Germany resulted in an actual loss to petitioner equivalent to the difference, in dollars, between their cost (360,771.89 blocked marks at $0.1437 or $51,842.92) and their

selling price (377,891 blocked marks at $0.1043 or $39,414.43) or $12,428.49. If petitioner's contention that it invested free marks in the securities in 1935 were upheld, by a parity of reasoning the transaction resulted in a gain; for it received in 1936 precisely the same kind of marks which it invested in 1935. In our judgment, however, the marks received upon the payment of the Ostdeutsch bond, the marks used in the purchase of the securities upon the Bourse, and the marks received upon their sale were all blocked marks.

Having concluded that the marks used in the purchase of the securities in 1936 were blocked marks, the question remains whether they had a fair market value. Petitioner urges that "the fourteen-cent rate which was stipulated ($0.1437) to be the sale price in the United States of 'blocked' marks of the kind here in question was not applicable" to the 360,771.89 invested in 1935 in the other securities. It relies upon the testimony of its American director as having shown conclusively that those particular marks could not be transferred to this country. We do not so construe his testimony. While he stated that it was the petitioner's policy to get its funds out of Germany as speedily as possible, he admitted he did not know whether any of its officers had requested that it be permitted to transfer the particular marks in question or not. Later he expressed the opinion that they either had applied for permission to transfer the funds and permission had been refused or "they knew that under the rules, laws and regulations prevailing, they could not obtain permission upon application and therefore did not apply." The evidence, in our judgment, falls far short of conclusively showing, as petitioner must show, that the particular marks could not have been transferred out of Germany and sold. That a market for them existed is clear. Under the circumstances, therefore, we are of the opinion the Commissioner committed no error in holding that the blocked marks received in 1935 had a fair market value of $0.1437.

Petitioner's alternative contention is that no gain or loss was recognizable on the receipt of the blocked marks in 1935 and therefore the basis for the computation of its gain or loss upon the securities sold in 1936 was the cost of the Ostdeutsch bond. It relies primarily upon the rationale of *Helvering* v. *Tex-Penn Oil Co.*, 300 U. S. 481, its postulate being that "the blocked marks were subject to such serious restrictions that it was impossible to realize dollars upon them." Such a finding, in effect, was made by this Board in *International Mortgage & Investment Corporation*, 36 B. T. A. 187. In that proceeding the petitioner could not obtain permission and was unable to transfer out of Germany any of the marks on deposit in German banks on July 13, 1931, there was no market in 1931 for the restricted marks, and the Commissioner's determination that the acquisition of such marks had resulted in a gain to the taxpayer was set aside. But no such fact

has been stipulated or shown in the evidence in the instant proceeding. The restrictions did not *prevent* the sale of blocked marks; they merely required that permission to transfer them be secured. Blocked marks were quoted on the market in New York at $0.1437 and some were transferred and sold by petitioner at that figure. No showing has been made that request for permission to transfer the 360,771.89 marks in issue had been made and refused. The evidence shows that $115,-629.69 in dollars was remitted to petitioner during 1935. The notice of deficiency and the Revenue agent's report attached to the petition indicate that almost a half million dollars ($423,284.15) was remitted during the next year, and the only witness who testified stated that blocked marks were sold by petitioner during each year from 1933 to 1941. In the face of this evidence it can not be found that the restrictions imposed by the German Government made it impossible for petitioner to have taken out the 360,771.89 if it had endeavored to do so. The authorities relied upon are therefore inapplicable.

Petitioner's final contention is that the rule of *Bowers* v. *Kerbaugh Empire Co.*, 271 U. S. 170, is applicable. It argues that "the Ostdeutsch transaction, including the securities purchased with the blocked mark proceeds thereof, should be regarded as a single transaction in which petitioner attempted to realize dollars and that the result in dollars was exactly that shown by its Federal income tax returns." We do not agree. The Ostdeutsch bond transaction was concluded in 1935 when petitioner received 440,000 blocked marks. Its subsequent investment of 360,771.89 blocked marks in other securities was a separate transaction. The cited case does not sanction the postponement of realized losses. The sale of the securities purchased with the 360,771.89 blocked marks resulted in a loss, in dollars. This loss has been allowed by the Commissioner in determining the deficiency in tax. Petitioner has failed to show that it sustained a greater one.

*Decision will be entered under Rule 50.*