Edmond Weil, Inc. v. Commissioner.
Edmond Weil, Inc. v. Commissioner
Docket Nos. 1773, 2690.
United States Tax Court
1944 Tax Ct. Memo LEXIS 143; 3 T.C.M. (CCH) 844; T.C.M. (RIA) 44271; August 9, 1944
*143 Nathan Immerman, Esq., 233 Broadway, New York, N. Y., for the petitioner. Arthur Groman, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: The petitions herein were filed for the purpose of redetermining the following deficiencies: Declared
Value
Excess
Docket
Income
Profits
Year
No.
Tax
Tax
1939
1773
$2,967.59
$105.38
1940
2690
3,494.93
106.57
The Commissioner, in the deficiency notice for each year, adjusted petitioner's net income for the taxable year involved by adding thereto the sum of $21,583.84, computed by converting 750,000 Brazilian milreis into United States dollars at the rate of exchange of $0.06058 and subtracting from the result thereof ($45,435) the sum of $23,851.16, which was petitioner's cost of 5,000 shares of stock in a Brazilian corporation. The principal question presented is whether the petitioner, which owned 5,000 shares of stock in Cia de Couros Pan Americana, S.A., the Brazilian corporation, realized taxable gain in the amount of $21,583.84 on the liquidation of the latter. If the answer to this question is in the affirmative, it will be necessary to determine whether *144 the gain was realized by the petitioner in 1939 or 1940. The Commissioner concedes that the petitioner is not taxable in both years. Some of the facts are stipulated; others are admitted. We adopt the stipulation filed by the parties and incorporate the same herein by reference. Our findings of fact are made from the evidence submitted at the hearing and upon these stipulated and admitted facts. Findings of Fact Edmond Weil, Inc. (hereinafter sometimes referred to as the petitioner) is a corporation duly organized and existing under the laws of the State of New York, with its principal office in New York City. Its return for each of the calendar years here in question was filed with the collector of internal revenue for the second district of New York. Both returns are made on an accrual method of accounting. Cia de Couros Pan Americana, S.A. (hereinafter sometimes referred to as the Corporation) was a Brazilian corporation with its principal office at Rio de Janeiro. Petitioner, for many years and immediately prior to the transactions herein involved, was the owner of 5,000 shares or 50 per cent of the common stock of the Corporation. Petitioner paid $23,851.16 in United States *145 dollars for these 5,000 shares and carried them on its books at cost. Thirty per cent of the Corporation's remaining shares was owned by Jack A. Agos and the other 20 per cent by Godofredo Wohl. An agreement was entered into on December 29, 1939, in New York City, by and between petitioner and Agos and Wohl. It provided that the Corporation was to be dissolved, liquidated, and wound up and that the organization of a newly limited partnership, known as Cia de Couros Pan Americana, Ltda., (hereinafter referred to as the Partnership) was to be completed by Agos and Wohl under the laws of Brazil in Rio de Janeiro with a capital of 1,500 contos of reis (Rs. 1,500,000). Agos and Whol acknowledged receipt of a loan from petitioner in the amount of 750 contos of reis (Rs. 750,000) "representing the one half of the total net assets" transferred from the Corporation to the Partnership; "the ownership of the said one half of the total net assets transferred was heretofore covered by the 5,000 shares of capital stock of the Cia de Couros Pan Americana S.A. and which were transferred to Agos and Wohl on December 29, 1939, by Edmond Weil, Inc. * * *." The loan was to be without interest, but was *146 to be secured by one-half of the total assets of the Partnership. In lieu of interest, petitioner was to receive one-half of the net profit of the Partnership during the lifetime of the loan. The loan was to be payable in Rio de Janeiro when called by petitioner on six months notice in writing. The instrument further recites that "the parties to this agreement wish to continue their business relations and capital interests and investments identically the same as before in substance, merely changing the form of organization * * *" and that "such change in organization has already been effected through the conversion of Cia de Couros Pan Americana, S.A. (a Brazilian Corporation) into Cia de Courous Pan Americana, Ltda. (a Brazilian limited company) with Agos and Wohl as its managing partners." This change was suggested by petitioner's attorney who advised that a nationalistic tendency in Brazil made it very difficult and very dangerous for American or other foreign business entitles to be stockholders in Brazilian companies. The agreement also contains additional provisions for the rendering of quarterly statements of accounts by the Partnership to petitioner. It gives petitioner an *147 option to buy from Agos and Wohl or from the survivor if either should die, all the assets of the Partnership. Provision is made for the price in the event of such a purchase and the agreement states that "one-half of the payment for the total net assets shall be effected by acknowledgment of full payment of the outstanding loan of seven hundred and fifty contos of reis (Rs. 750,000 $ 000)." Provision is also made in the agreement for the settling of any disputes arising thereunder by arbitration. Paragraph XVI of the agreement provides as follows: "This agreement cancels and supersedes the letter agreement No. 869, of November 9, 1939, except as to the transfer of the stock from Weil, Inc. to Agos and Wohl for the purpose of converting the Cia de Couros Pan Americana S.A. into the limited partnership which has already been consummated, as well the as repurchase from Agos by Weil, Inc. of its own Capital Stock previously owned by the said Agos." The dissolution of the corporation was effected on December 29, 1939, as provided in the agreement and the Corporation ceased to do business by the close of the calendar year, 1939. The organization of the Partnership was completed pursuant *148 to the laws of Brazil, and the Partnership, consisting of Agos and Wohl, commenced to do business on January 1, 1940. Petitioner continued to do business with the Partnership in 1940 in the same manner as it had done with the Corporation throughout 1939. Petitioner transferred the 5,000 shares of the Corporation's capital stock to Agos and Wohl on December 29, 1939. The consideration for the transfer was the sum of 750,000 Brazilian milreis which was the value of petitioner's interest in the Corporation as represented by those shares of stock and which petitioner loaned to the newly created Partnership on the same date. Thereafter, on January 1, 1940, an entry was made on the books of the Partnership to reflect the Partnership's indebtedness to petitioner in the sum of 750,000 milreis. The transaction which respondent claims resulted in taxable gain to petitioner took place during the calendar year 1939. During the months of December 1939 and January 1940, the commercial rate of exchange in New York City of Brazilian milreis was 5.10 cents ($0510); the official rate of exchange was $0.06058. Petitioner was never paid the official rate in connection with any exchange transactions. *149 Decree No. 23.258 of the Provisional Government of the Republic of the United States of Brazil, effective October 19, 1933, provides in part as follows: "Considering that the banking regime was established in the interest of the public good in order to, among other purposes, prevent and restrain gambling with exchange, thus ensuring only legitimate operations; (and) * * * * *
"Considering that the Law No. 4,182, of 1920, Art. 5, gives authority to the Government to stipulate conditions and guarantees which may be necessary to regulate exchange operations and to suppress gambling with exchange; (and) "Considering further that the objective of the Government has been to centralize in the Banco do Brazil everything appertaining to the exchange market, in accordance with Decree No. 20.451, of September 28, 1931 which conferred upon this credit establishment the monopoly of purchasing export drafts and values transferred to foreign countries, with a view of making an equitable distribution of exchange possible, and the intent to meet exterior public obligations, importations of merchandise and other necessities; (and) * * * * *
DECREES: "Art. 1. - Exchange transactions are considered *150 unlawful if made between banks, natural or legal persons, residing or established within the country, with any entities outside, when such transactions are not passing thru banks accustomed to operate in exchange, with previous authorization from the Banking Regime in charge of the Banco do Brasil. "Art. 2. - Likewise unlawful are exchange transactions made in Brazilian currency by entities domiciled within the country for account and order of Brazilian or foreign entities domiciled or resident outside. "Art. 3. - Subject to penalties are those who conceal coverages of export values, as well as increase in price of imported merchandise in order to obtain undue coverages. * * * * *
"Art. 6. - Infractions of Art. 1, 2 and 3, shall be punished by a maximum fine of double the amount of the transaction, and a minimum of five Contos of reis (5:000 $ 000), under the terms of Art. 5, $1, letter b, of the above Law No. 4.182." Decree No. 170, by the President of the Brazilian Republic, effective January 5, 1938, provides in part as follows: "Art. 1. - Orders for payment from abroad, in national currency, may only be fulfilled by means of a simultaneous sale to the Banco do Brasil of *151 the corresponding foreign exchange, at international rates of exchange, in cover of such requests. "Art. 2. - No firm, individual or collective, bank or banking house, established within the country, may keep debit balances on their books, in national currency, in the name of the individual or collective firm, bank or banking house established outside the country. "Sole Paragraph: Debit balances, as of this date, must be communicated to the Banco do Brasil, by the parties concerned, within 48 (forty-eight) hours from the date of publication of this decree-law. These debit balances must be liquidated within the unextendable period of 30 (thirty) days, beginning with this date, by selling to the Banco do Brasil, as equivalent coverage, foreign exchange of international course. "Art. 3. - May be disposed of: credit balances, in national currency, of individual or collective firms, banks or banking houses, established abroad, in account current with firms, banks or banking houses, established within the country, provided these balances are the result of transactions realized here, and not of remittances or orders of payment from abroad, and represent the proceeds of: (a) collections *152 from abroad, duly substantiated by presenting the necessary documents, of importation of merchandise, to the (respective) office of the Treasury; (b) sale of merchandise consigned, originating abroad; (c) interests, dividends, contractual rents or loans. "Art. 4. - Infractions of these regulations shall be punished with the same penalties provided for in Art. 7 of the decree-law No. 97, of December 25, 1937." At no time during 1939 or 1940 did petitioner make an effort to take its capital out of Brazil. No difficulties were encountered with the Brazilian authorities in connection with the dissolution of the Corporation and the formation of the Partnership. Petitioner could have invested its funds during the taxable years in question in any other Brazilian corporation or partnership, if it had wanted to do so. Petitioner's investment in the Partnership has been profitable and petitioner has actually derived profits as a result of leaving its capital in Brazil. During the calendar year, 1939, petitioner was credited by the Corporation with the sum of $13,497.98. Item 12 of petitioner's gross income, as contained in its corporation income and excess profits tax return for 1939, *153 includes as "Dividends" the amount of $13,497.98, and in Schedule G the name and address of the "Paying Corporation" is listed as "Cia de Couros Pan Americana, Rio de Janeiro," (the Corporation). That return also shows that petitioner was the owner of 5,000 shares of Cia de Couros Pan Americana, S.A., which it listed in its balance sheets (Schedule O), both at the beginning and at the end of the taxable year, as an asset in the amount of $23,851.16. During the calendar year, 1940, petitioner was credited by the Partnership with the sum of $6,056.15. Item 12 of petitioner's gross income, as contained in its corporation income, declared value excess profits, and defense tax return for 1940, includes as a "Distribution" the amount of $6,056.15 and in Schedule E the name and address of the "Paying Corporation" is listed as "Couros Pan Americana, Ltda., Rio de Janeiro" (the Partnership). This sum of $6,056.15 represents petitioner's share of the Partnership's profits. No part of petitioner's capital investment in the Partnership, i.e., the loan, has ever been brought into the United States. In its return petitioner stated in answer to question No. 13 on page 3 that it did not at any time *154 during the taxable year, 1940, own directly or indirectly any stock in a foreign corporation. In the balance sheets (Schedule L) of the same return, petitioner listed as one of its assets at the beginning of the taxable year, stock in the Corporation in the amount of $23,851.16; but, in lieu of that particular asset, petitioner listed as one of its assets at the end of the taxable year, the loan to the Partnership in the amount of $37,500, and as one of its liabilities an item in the amount of $13,648.84, described as "Reserve Unrealized Profit & Fluctuations Brazilian Exchange." After petitioner's books of account were audited by an agent of the Bureau of Internal Revenue in 1942, petitioner's accountant made inquiries of the Brazilian Embassy in Washington, D.C., as to whether a capital investment in Brazil could be "expropriated and remitted to the United States." Petitioner's accountant was advised by letter dated September 5, 1942, by that Embassy that "Under present regulations in Brazil all remittances of money to foreign countries is subject to prior authorization from the Banco do Brasil." Petitioner's accountant also received a letter dated September 9, 1942, from the *155 Financial Division of the Department of State at Washington, D.C., advising him that "Prohibition or restriction of exportation or withdrawal of capital is a common basic provision in exchange control laws and regulations and is understood to have been in force for several years in Brazil." Finally, petitioner's accountant received a letter dated September 26, 1942, from the International Economics Unit of the Department of Commerce at Washington, D.C., which reads as follows: "The Brazilian exchange regulations give to the Exchange Control Office in the Bank of Brazil full discretion in the granting of exchange. There is no prohibition against the exportation of capital, but the Exchange Control Office has consistently declined to furnish exchange for this purpose and there is no indication that any change is contemplated." Opinion Our question is whether, under the facts as set forth above, petitioner realized taxable income under section 22 (a) of the Internal Revenue Code[1] either in 1939 or 1940. *156 Petitioner contends that Brazilian laws were such during 1939 and 1940 that the rule laid down in International Mortgage and Investment Corporation, 36 B.T.A. 187, compels a holding in the instant case that petitioner realized no gain for Federal income tax purposes. We can not agree with the petitioner. We are of the opinion that the instant case is distinguishable from the International Mortgage and Investment Corporation case, supra, on the same grounds that the latter case was distinguished by this Court in the case of Credit & Investment Corporation, 47 B.T.A. 673. At pages 681 and 682 of its opinion in the Credit & Investment Corporation case, this Court in referring to the International Mortgage and Investment Corporation case made the following statements: * * * In that proceeding the petitioner could not obtain permission and was unable to transfer out of Germany any of the marks on deposit in German banks on July 13, 1931, there was no market in 1931 for the restricted marks, and the Commissioner's determination that the acquisition of such marks had resulted in a gain to the taxpayer was *157 set aside. But no such fact has been stipulated or shown in the evidence in the instant proceeding. The restrictions did not prevent the sale of blocked marks; they merely required that permission to transfer them be secured. * * * No showing has been made that request for permission to transfer the 360,771.89 marks in issue had been made and refused. The evidence shows that $115,629.69 in dollars was remitted to petitioner during 1935. The notice of deficiency and the Revenue agent's report attached to the petition indicate that almost a half million dollars ($423,284.15) was remitted during the next year, * * *. In the face of this evidence it can not be found that the restrictions imposed by the German Government made it impossible for petitioner to have taken out the 360,771.89 if it had endeavored to do so. The authorities relied upon [including International Mortgage & Investment Corp., 36 B.T.A. 187 are therefore inapplicable. In the instant case, the law of Brazil, as it is set forth in the stipulation of facts, indicates that the Banco do Brasil had exclusive control over the granting of exchange and that there was no absolute prohibition *158 against the exportation of capital. It is difficult to discern in the Brazilian law as stipulated by the parties any distinction in the treatment afforded Brazilian corporations and Brazilian partnerships and petitioner points out no such distinction on brief. Furthermore, as in the Credit & Investment Corp. case, supra, we note in the instant case that petitioner received during 1939 from the Brazilian Corporation $13,497.98, and the sum of $6,056.15 in 1940 from the Partnership; that at no time in 1939 or 1940 did petitioner make an effort to take its capital out of Brazil; and, finally, that petitioner's investment in the Partnership has been profitable at all times since the creation of the Partnership. In its reply brief, petitioner admits that "Brazil did not prohibit the export of profits from current commercial transactions * * *." This accounts for the receipt by petitioner of $13,497.98 (U.S. dollars) from the Corporation in 1939 and the sum of $6,056.15 (U.S. dollars) from the Partnership in 1940. But petitioner asserts that the Brazilian law "* * * did prohibit the export of capital investments." The Brazilian law in evidence contains no such distinction and *159 affords no basis, either alone or together with other evidence, upon which this Court might conclude that in 1939 or 1940 the "export of profits from current commercial transaction" by a Brazilian corporation was permitted, whereas the "export of capital investments" of a Brazilian corporation, in the process of dissolution, to its stockholders, one of whom was a corporation organized under the laws of the State of New York, was prohibited. Petitioner fails to point out the specific language in the Brazilian decrees upon which it relies for this distinction and we can find none. We next consider the question, apart from the Brazilian laws, which we have concluded do not affect petitioner's tax liability in this case, whether, as a matter of general law, the petitioner did realize a taxable gain as a result of the transactions herein involved. In the case of E. C. Huffman, 1 B.T.A. 52, we stated at page 54, that "When, therefore, the corporation dissolved there came immediately, in contemplation of law, into the possession and control of the stockholders all of the corporation's assets. At that moment the individual stockholder must be regarded as having *160 received his share of these assets with whatever gain or loss their receipt entailed." The Huffman case has been consistently followed by this Court. Cf. T. T. Word Supply Co., 41 B.T.A. 965, 982; Mrs. C. J. Barnard, 18 B.T.A. 1022; Alice M. Hastings, et al., 8 B.T.A. 670; G. D. Rigsby, 6 B.T.A. 194. The character of that which petitioner received upon the dissolution of the corporation is not changed by what it did with it thereafter, irrespective of how soon, and the fact that petitioner did not become in form a partner in the new Partnership is immaterial. We note that the petitioner could not have loaned the new Partnership the stock which it formerly owned in the Corporation, and that petitioner could not loan the Partnership any interest it had in the Corporation, because when the loan was made petitioner no longer had the stock or any interest in the Corporation. What petitioner did loan the Partnership was the proceeds of the stock which proceeds petitioner is legally presumed to have received upon the dissolution of the Corporation. Petitioner *161 did this pursuant to a contract voluntarily entered into by it, and to the extent that those proceeds exceeded petitioner's cost of the stock, petitioner received a taxable gain. Cf. Thomas N. Perkins, 33 B.T.A. 606, 625. Petitioner contends, however, that the only change effected was in the nature of its investment from shares of stock to a loan, and that it was a change in form but not a change in substance. However, such a contention is not persuasive here. As the Circuit Court of Appeals for the Ninth Circuit recently pointed out in the case of Clover v. Commissioner, 143 Fed. (2d) 570, "The choice of disregarding a deliberately chosen arrangement for conducting business affairs does not lie with the creator of the plan.' Gray v. Powell, 314 U.S. 402, 414. The quoted principle is opposite in the tax field, Higgins v. Smith, 308 U.S. 473, 477, * * *." The instant case is not a case where a stockholder's interest in a corporation may be said to have undergone a change from that of a stockholder to that of a creditor of the same corporation, because in *162 the instant case the Corporation was dissolved and ceased to exist. Petitioner advances a related argument, namely, that the value of the stock which it owned in the Corporation was carried on the latter's books immediately prior to its dissolution at 750,000 milreis; that the same amount was transferred to petitioner's credit on the books of the partnership; and that, therefore, there being no gain in milreis realized in Brazil, there was no gain in dollars realized in New York. We can not agree. It does not follow that because the book value of petitioner's shares of stock in the Corporation was 750,000 milreis and the books of the Partnership reflected a liability to petitioner in the same amount after the dissolution of the Corporation, that petitioner realized no gain. Petitioner's interest in the Partnership is qualitatively different from its former interest in the Corporation. That change in interest was effected by the dissolution of the Corporation and by the loan to the Partnership by petitioner (and not by the Corporation) of an amount equal to petitioner's former share of the Corporation's assets, as represented by the stock transferred to Agos and Wohl. Respondent does *163 not seek to tax petitioner on an unrealized appreciation in the value of its interest as a stockholder in the Corporation. Respondent is taxing, under the authority of section 22 (a), I.R.C., the gain realized by petitioner upon the receipt of its share of the assets of the Corporation upon the latter's dissolution. Petitioner has not sustained the burden of proving the invalidity of the Commissioner's determination in this respect. We have found as a fact that the transaction which resulted in taxable gain to petitioner took place during the calendar year 1939. That finding is supported by the following evidence: The agreement providing inter alia for the terms of the repayment of the loan, the rendering of quarterly statements of account by the Partnership to petitioner and for an option to petitioner to purchase the Partnership's assets was dated December 29, 1939. The 5,000 shares of the Corporation's stock which petitioner owned were transferred to Agos and Wohl on December 29, 1939, by petitioner. The agreement recites that "Agos and Wohl hereby acknowledge receipt of a loan from Weil, Inc. in the amount of seven hundred and fifty contos of reis (Rs. 750,000 $ 000) representing *164 the one-half of the total net assets transferred from [the Corporation] * * * to the * * * partnership * * *, the ownership of the said one-half of the total net assets transferred was heretofore covered by the 5,000 shares of capital stock of the [Corporation] * * * and which were transferred to Agos and Wohl on December 29, 1939, by Edmond Weil, Inc. * * *." The agreement also speaks of the change in organization as having "already been effected through the conversion of Cia de Couros Pan Americana, S.A. (a Brazilian Corporation) into Cia de Couros Pan American, Ltda. (a Brazilian limited company) with Agos and Wohl as its managing partners" and again of the conversion of the Corporation into the limited partnership as having "already been consummated." In its 1940 tax return petitioner stated under oath that it did not at any time during the taxable year 1940 own directly or indirectly any stock in a foreign corporation. Even though the Partnership may not have commenced to do business until January 1, 1940, the events which establish whether or not petitioner realized a gain for Federal income tax purposes occurred in 1939, and, therefore, we conclude that the gain was realized *165 by petitioner in 1939. The remaining question concerns the amount of the gain realized by petitioner in 1939. Both parties agree that the cost of the 5,000 shares of the Brazilian Corporation to petitioner was $23,851.16. To obtain the amount of the gain we have merely to convert 750,000 milreis into United States dollars as of December 29, 1939. The Commissioner contends for the use of the so-called "official" rate of exchange of $0.06058, as contrasted with the so-called "commercial" rate of exchange of $0.0510. The stipulation provides that "During the months of December 1939, and January 1940, the rate of exchange in New York, New York, of Brazilian milreis was 5.10 ." It makes no distinction between the official and commercial rates of exchange. Furthermore, the evidence establishes that petitioner was never paid the "official" rate in exchange transactions. Taxation is a practical matter. We apply the commercial rate. Therefore, upon the dissolution of the Corporation, petitioner received as its share of the corporate assets 750,000 milreis, which, when converted into United States dollars, would have amounted to $38,250.00. We hold, therefore, that the proper rate of exchange *166 to be used is $0.0510 and that petitioner realized a taxable gain under section 22 (a), I.R.C., in 1939, in the amount of $14,398.84. Decision in docket No. 1773 will be entered under Rule 50. Decision in docket No. 2690 will be entered for the petitioner. Footnotes
1. SEC. 22. GROSS INCOME. (a) General Definition. - "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * *, of whatever kind and in whatever form paid, or from professions, vocations, trade, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *↩