**EDMOND WEIL, Inc., v. COMMISSIONER OF INTERNAL REVENUE.**

No. 274.

Circuit Court of Appeals, Second Circuit.

July 19, 1945.

Nathan Immerman, of New York City, for petitioner, Edmond Weil, Inc.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, A. F. Prescott and Morton K. Rothschild, Sp. Assts. to Atty. Gen., for respondent Commissioner of Internal Revenue.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The taxpayer, Edmond Weil, Inc., a New York corporation, owned 50% of the stock of a Brazilian corporation. Its other stockholders were Agos and Wohl, who owned 30% and 20% of the stock respectively. The holdings of the stock were 5000 shares by Edmond Weil, Inc., 3000 shares by Agos and 2,000 shares by Wohl. Because the taxpayer was advised by counsel that the nationalistic tendency in Brazil made it dangerous for Americans or other foreigners to hold stock in a Brazil corporation the stockholders entered into an agreement on December 29, 1939, whereby the Brazil corporation was to be dissolved and liquidated and Agos and Wohl were to complete the organization of a newly formed partnership under the laws of Brazil with a capital of 1,500,000 milreis representing the net assets transferred by the corporation to the partnership. By the terms of the agreement one-half of these assets, amounting to 750,000 milreis, was to be furnished from the net share of the taxpayer in the corporate assets, and the balance of 750,000 milreis, from the net share of Agos and Wohl. Under the agreement it was provided that the former stock interest of Edmond Weil, Inc., in the corporation should become a loan to the partnership without interest and evidenced by an acknowledgment in the agreement of receipt of the loan by Agos and Wohl of 750,000 milreis. Under the agreement this loan was to be callable on six months notice by the taxpayer which was to receive one-

half of the net profits of the partnership in lieu of interest during the life of the loan.

On December 29, 1939 the corporation was dissolved, as the agreement provided, and on the same date the taxpayer transferred its 5000 shares to Agos and Wohl who in that way, through the dissolution of the corporation, received title to the one-half share of the net assets, payable to the taxpayer, as a loan. The loan to the partnership by the taxpayer was entered on the books of the partnership on January 1, 1940, when the latter began active business.

During the months of December 1939 and January 1940 the commercial rate of exchange for Brazilian milreis in New York City was 5.10 cents and the official rate of exchange was .06058. The taxpayer was never paid the commercial rate of exchange in connection with any of its transactions.

■ The cost of taxpayer's stock was $23,851.16 and at the end of 1939 it carried the loan to the partnership at $37,500 and the difference, amounting to $13,648.84, as an "unrealized profit" accrued through the conversion of the stock into the loan. In computing the tax liability for this gain the Commissioner computed the loan of 750,000 milreis into dollars at the "official" and not at the "commercial" rate of exchange and assessed the difference between the sum derived and the amount originally paid in dollars for the stock as the taxable gain. The Tax Court modified the assessment by adopting the commercial rather than the official rate of exchange and on that basis found a taxable gain of $14,398.-84, rather than of $21,583.84, as assessed by the Commissioner, and accordingly adjudged a deficiency in income tax of $1,943.43 for the year 1939. We think that the Tax Court was right and should be affirmed.

■ The taxpayer contends that there was no taxable gain on the ground that the conversion of the stock into a loan was involuntary because it was impelled by fear of confiscation. In our opinion there was no "threat or imminence" of confiscation and at worst only an apprehension on the taxpayer's part that it might not be able to continue its stock holdings in the Brazil corporation. But even if there had been legislation justifying a fear of nationalization of the corporation, such a step would seem to be little different from the existing legislation against holding companies by our Congress, and not in any legal sense confiscation, and the conversion of shares of stock into a loan, whether voluntary or involuntary, would not enable any gain from the transaction to escape from taxation because of the provisions of 26 U.S. C.A. Int.Rev.Code, § 112(f), for the property converted was not "expended in the acquisition of other property similar or related in service * * * to the property * * * converted." The gain would not obtain the advantages afforded by Section 112(f), for the taxpayer converted his stock holdings not into stock in another corporation engaged in like activities but into a loan secured by one-half of the assets of the borrowing partnership. Such a secured loan callable on six months notice was vitally different from a stock interest which was not secured but was continually subject to the risks of the business.

■ The taxpayer objects to the decision of the Tax Court principally on the ground that there was no taxable capital gain since it "could not export the gain to the United States". Even if this were so, the taxpayer could not succeed and we ought to do no more than remand so that evidence might be presented to show some other basis for measuring an evident gain than current rates of exchange—just as we did in Eder v. Commissioner of Internal Revenue, 2 Cir., 138 F.2d 27. But we think inability to export capital from Brazil to the United States was not so established as to justify our disregarding a decision of the Tax Court to that effect. The taxpayer concedes that there was no prohibition of the Brazil Government against the export of capital and that in saying capital could not be exported it had to rely on a letter from the International Economics Unit of the United States Department of Commerce stating that there existed "no prohibition against the exportation of capital, but the Exchange Control Office has consistently declined to furnish exchange for this purpose and there is no indication that any change is contemplated."

It is true that in September 1942 taxpayer's accountants had been informed through a letter from the Brazilian Embassy in Washington that: "Under present regulations in Brazil all remittances of money to foreign countries is subject to prior authorization from the Banco Brasil", and this injunction was undoubtedly fully justified by the following provisions of Decree No. 23,258 of October 19, 1933 made by the Brazil Government:

"Art. 1—Exchange transactions are considered unlawful if made between banks,

952

natural or legal persons, residing or established within the country, with any entities outside, when such transactions are not passing thru banks accustomed to operate in exchange, with previous authorization from the Banking Regime in charge of the Banco do Brasil."

"Art. 2—Likewise unlawful are exchange transactions made in Brazilian currency by entities domiciled within the country for account and order of Brazilian or foreign entities domiciled or resident outside."

In 1939 and 1940 the taxpayer's investments in Brazil yielded profits which were transmitted to New York. At no time during either of those years was an effort made to remove the capital from Brazil. Indeed large earnings were being realized from the investments there and there probably was no desire to remove the capital to America. Moreover, it is to be observed that the inquiries as to whether capital investments could be remitted to the United States were not made until September 1942, nearly three years after the gain was realized on December 29, 1939. The answer of the United States Department of Commerce by letter of September 26, 1942, to the inquiry made by taxpayer's auditors regarding the exportation of capital from Brazil was not only, strictly speaking, hearsay but was not current with transactions in the year 1939. Even if the letter was entitled to some persuasive force, its weight, in the face of a failure to call experts or produce direct testimony as to the practice of the Bank of Brazil regarding exports of capital, was a matter for the Tax Court.

The Tax Court found that the Brazilian law contained no distinction between exportation of capital investments and income and that it afforded no basis upon which the conclusion could be drawn "that in 1939 or 1940 the 'export of profits from current commercial transaction' by a Brazilian corporation was permitted, whereas the 'export of capital investments' of a Brazilian corporation, in the process of dissolution, to its stockholders, one of whom was a corporation organized under the laws of the State of New York, was prohibited."

The burden was upon the taxpayer to establish that the assessment of gain could not be made upon the basis of current exchange. The determination that it could be made was one of fact as to which the findings of the Tax Court were conclusive.

Order affirmed.