FERDINAND CINELLI and SARAH M. CINELLI, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Cinelli v. Commissioner
Docket No. 6337-70
United States Tax Court
T.C. Memo 1973-140; 1973 Tax Ct. Memo LEXIS 148; 32 T.C.M. (CCH) 674; T.C.M. (RIA) 73140; June 26, 1973, Filed. William P. Thorpe, for the petitioners. James E. Keeton, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' Federal income tax for their taxable year 1965 in the amount of $5,091.76. By an amendment to his answer respondent claims an increased deficiency of $553.64 making the total deficiency in controversy for the year 1965 an amount of $5,645.40. 2 The issue for decision is whether the petitioners are entitled to deduct $10,000 or any part thereof as a business loss during their taxable year 1965 as a result of the death of chestnut trees on their property in Siena, Italy. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided at Grosse Pointe Farms,Michigan, at the time they filed the petition in this case, filed a joint Federal income tax return for the calendar year 1965 with the *150 district director of internal revenue, Detroit, Michigan. Ferdinand Cinelli, hereinafter referred to as petitioner, was born in Detroit. He was taken to Italy when he was eight months old and lived there from that time until 1948. In 1948, petitioner returned to the United States and has continued to live here since that time. Petitioner's father, Delfino Ferdinando Cinelli, an Italian citizen, died on May 1, 1942. Petitioner's mother, Hartz Alden Francesca Cinelli, is an American citizen. She was 50 years old when her husband died in 1942. Petitioner's mother was alive at the time of the trial of this case in 1972. Petitioner has two sisters, Federica and Giovanna, both of whom were born in Italy. At the time of his death in 1942, petitioner's father was the sole owner of the estate of Spannocchia which is located 52 miles south of Florence and 12 miles west of Siena, Italy. The estate is in the Province of Siena in the counties of Chiusdino and Sovicille. Upon the death of his father, petitioner and his two sisters each 3 inherited an undivided one-third interest in the estate of Spannocchia subject to their mother's interest in the estate's profits for her life. *151 When petitioner inherited his interest in the estate in 1942, it consisted of 1,194.71.44 hectares. One hectare equals 2.471 acres. In 1942, operations on the Spannocchia estate included livestock production, wheat farming, grape and olive growing, timber cutting and quarrying. About 85 hectares, approximately 80 percent of the cultivated land, was planted in wheat in rotation with grass. Wheat would be planted in the first year of a 3-year cycle, wheat and grass in the second year, the wheat being harvested before the grass would begin to grow, and only grass in the third year. Livestock on the estate would graze on the land when it was planted in grass. The remaining portion of the cultivated land in 1942 or about 24 hectares was used for growing grapes and olives. Each year nearly 3,500 bottles of wine were produced from the grapes grown on the estate. The wine was sold to persons living on the estate. The olive crop consisted of about 5,600 kilograms in 1942. The estate contained approximately 650 hectares of wooded area exclusive of the chestnut groves. One-twelfth of the woodlands were cut each year and used to produce charcoal. The charcoal was sold all over northern *152 Italy and it was in great demand in 1942 because the distribution of gas and electricity was not widespread. In more recent years, the demand for charcoal has fallen off extensively. 4 There was a quarry on the estate from which stones were taken and then granulated and made into small bricks. Sheep, pigs and cattle were raised on the estate of Spannocchia in 1942. Some of the livestock were wholly-owned by petitioner's family (stalle a economia) and some were owned in partnership with the various tenant farmers living on the estate (stalle a Mezzadria). The sheep were raised primarily for their milk and for cheesemaking. The cattle were often used for plowing the fields. One hundred twenty hectares of the Spannocchia estate consisted of chestnut groves. In 1942 there were between 12,000 and 15,000 chestnut trees in the groves. The trees were nearly 200 years old and were very large. Chestnut trees of this type in Italy normally live and bear well in excess of 200 years. Each October the nuts on the chestnut trees ripened and fell to the ground. Certain piglets produced on the estate would be selected to forage in the fallen chestnuts during during the months of *153 October, November and December. Generally between 120 and 150 piglets would be allowed to forage among the fallen chestnuts. In December or January, the piglets would be shipped to north Italy where they would be fattened and sold. The chestnut-fed pigs of the Spannocchia estate were especially desirable for their high quality. 5 In 1942 there were 24 tenant-farmer families living on the Spannocchia estate. The tenant-farmer families lived in farmhouses, each of which had nearby a stable and a barn. None of these buildings had central heating, running water, or electricity. There was also a castle on the estate which was uninhabited in 1942. More recently it has been restored and utilized as an art studio for students from various universities. Other buildings on the estate included the home of the farm agent and the villa, a 4-bedroom house where petitioner and his sisters lived in 1942. Petitioner's mother was in America in 1942 but since the end of World War II has used this villa as her principal residence. Since 1948 petitioner has spent several weeks about twice a year at the villa. The estate of Spannocchia was valued at 4,314,000 liras as of the date of *154 the death of petitioner's father for Italian inheritance tax purposes. This valuation was reached following bargaining between the executor of the will and the Italian taxing authorities. The official exchange rate between United States dollars and Italian lira was 19.1 lira to the dollar in 1942 although because these two countries were at war there was little, if any, actual exchange of currency at this rate. Immediately following World War II, the exchange rate was approximately 600 lira to the dollar. There was a black market for American currency in Italy in 1942 in which the rate of exchange was as much as 800 lira to the dollar. Any banks in Italy which would honor checks drawn on American banks in 6 United States currency would do so only at the official exchange rate of 19.1 lira to the dollar in 1942. Petitioner avoided having to make exchanges at the official rate during World War II. He in fact did not know of any exchanges made at the official rate but it was generally accepted that only those in desperate need would make such an exchange. It would have been very difficult, if not impossible, to convert lira into dollars at the official rate. For the average *155 individual in Italy in 1942, it would not have been possible to convert an amount as large as 4 million lira into dollars. Furthermore, it would have been extremely difficult, if not impossible, for the petitioner and his sisters to have sold the estate of Spannocchia to an American buyer for American dollars in 1942. Certain farm properties owned by petitioner's family and located close to the estate of Spannocchia were sold by the petitioner and his mother and sisters in 1951 and 1953. A farm consisting of 43.5 hectares of rather poor land sold for 400,000 lira in 1951 and a farm consisting of 50.9 hectares of good farmland sold for 2,900,000 lira in 1953. In 1954 petitioner's sister Giovanna requested that the estate of Spannocchia be partitioned and that her share be sold. The sale took place on February 19, 1954. The amount of land sold was 364 hectares and the sales price was 29,000,000 lira. Petitioner and his sister Federica remained co-owners of an estate consisting of 697 hectares subject to the interest of their mother. 7 Included in the portion sold as a result of the partition were about half of the cultivated lands of the estate, including most of the olive *156 trees and vineyards and about 15 percent of the chestnut groves. In 1962 petitioner exchanged his interest in a commercial building located in Florence, Italy for his sister Federica's interest in the estate of Spannocchia. Petitioner had received his interest in the Florence building by way of gifts made over a period of years. Petitioner and Federica agreed that his interest in the Florence building and her interest in Spannocchia were each worth about $70,000. In 1960 a 27.4 hectare farm near Spannocchia with a quarry on it was sold for 5,000,000 lira. After his father's death in 1942 petitioner continued to operate the estate in much the same manner as it had been operated over prior years. Some activities were dropped or decreased and others increased. Petitioner employed an estate agent to supervise the farming activities. There were between 30 and 35 sows on the Spannocchia estate in the years before 1965 and each sow would bear on the average of 15 piglets per year. The piglets which were not selected to forage among the chestnuts were fed meal and were sold as piglets. Those piglets which foraged among the chestnuts were not fed meal during the other parts of *157 the year but would live on their mother's milk and then grass and during the autumn lived solely on the fallen chestnuts. 8 Most of the pigs which were chosen to forage among the chestnut groves were held by petitioner in partnership with the tenant farmers. Up until 1950, the tenant and the farm landlord split profits evenly. After 1950, a government decree ordered that the tenant's share be increased to 58 percent and the landlord's reduced to 42 percent of the profits. In compliance with accepted practice in Italy, the fiscal year for tenant farmers and landowners ended on January 31, of each calendar year. The end of January is a period of little activity on Italian farms and for 300 or 400 years, the first of February has marked the beginning of the fiscal year for tenant farmers and their landlords. Of the 24 tenant families on the Spannocchia estate in 1942, only 16 remained following the partition of the property in 1954. By 1963 there were only 7 families, 6 in 1964 and 5 in 1965. As the number of tenant farms decreased, certain marginal activities of the farms such as raising grain and wine production were abandoned and the production of pigs increased. By *158 the terms of the agreements between petitioner as landlord and his tenant farmers, petitioner purchased all items necessary to raise the crops and livestock. When the crops or livestock were sold, the direct costs would be subtracted from the gross sales price and the profit, if any, would be divided between petitioner and the tenant according to the applicable percentage rate. Indirect expenses such as taxes and depreciation would be borne solely by the landlord. The landlord also had the obligation to keep the tenant's farmhouse in repair. 9 In 1962 petitioner and his estate agent first noticed that a blight was attacking the chestnut trees on the estate.The blight would cause the bark on the chestnut trees to crack and the wood would disintegrate. During the taxable years ended January 31, 1963, 1964, 1965 and 1966, approximately 90 percent of the chestnut trees on the estate were destroyed. Of the trees that were destroyed, about one-sixth died in fiscal year 1963, one-half in fiscal year 1964, one-third in fiscal year 1965 and a few in the fiscal year 1966. The great majority of the chestnut trees which died in the fiscal year ending January 31, 1965, died in the calendar *159 year 1964. The technical name of the disease which afflicted the trees is phythophtora cambivora. The blight had been afflicting chestnut groves in Italy as early as 1956 but it was not until the fiscal year 1963 that it afflicted the chestnut trees on the estate of Spannocchia. A chestnut tree which is infected with the blight dies in about 12 months following the first signs of infection. As a result of the death of the chestnut trees, pig production at Spannocchia rapidly declined. For the fiscal year ended January 31, 1963, petitioner's net income from the sale of pigs, cattle and sheep totalled 1,892,000 lira or $3,051. For the fiscal year ended January 31, 1964, petitioner's income from pig production was 1,356,000 lira or $2,187. For the fiscal year ended January 31, 1965, petitioner's net profit from pig production was 117,702 lira or $200. 10 When the chestnut blight struck chestnut trees in the United Statesthe United States Forest Service determined that the heartwood of chestnut trees dead for from 1 to 8 years was about as sound as that of healthy trees. Long dead chestnut wood remains a valuable source of vegetable tanner, a material needed in tanning *160 leather. Petitioner was unable to use the dead chestnut trees for producing charcoal. He found no other use for the dead chestnut trees. Those chestnut groves which have been cleared have been replanted with other varieties of trees, primarily fir and pine. As of January 31, 1966, the estate of Spannocchia consisted of 697 hectares of which over 500 hectares were wooded. An additional 66 hectares were the chestnut groves which were 90 percent dead. The olive trees which had flourished in the 1940's had been completely destroyed by the frosts of 1956 and the winter of 1962-1963. The demand for charcoal had greatly diminished because electricity and cooking gas were being widely distributed. The estate incurred losses in the following fiscal years in the amounts indicated: Fiscal Year Ended January 31
Amount (in lira) 1962
1,125,735
1963
3,118,859
1964
2,287,603
1965
3,335,158
1966
5,613,061
Petitioner deducted the losses for the fiscal years 1962, 1963, 1964, 1965 and 1966 on his United States Federal income tax returns for the calendar years 1962, 1963, 1964, 1965 and 1966, respectively. 11 Petitioner did not depreciate either the chestnut *161 trees or the olive trees for any year following 1942. Petitioner has reported a loss from farm operations conducted at Spannocchia on the basis of the loss incurred for the fiscal years ended in January being reported in the calendar year in which the end of the fiscal year fell on each of his Federal income tax returns since the calendar year 1948. During the year 1965, petitioner received income from the Spannocchia Hunting Reserve in the amount of $1,058.23, and this item was not reported in the petitioner's income tax return for the year 1965. Petitioner on his Federal income tax return for the calendar year 1965 reported on Schedule D - Part III - "PROPERTY OTHER THAN CAPITAL ASSETS" a loss of $10,000 designated as "Loss by disease to income-producing chestnut trees, Est. of Spannocchia, Siena, Italy." In a note typed in the bottom margin of the page on which the loss was reported, petitioner stated that the loss was the lesser of (1) the difference between the value immediately before and after the loss, and (2) the adjusted cost basis of the property. Respondent disallowed the claimed loss of $10,000 with the following explanation: (a) Loss From Property Other Than *162 Capital Assets The loss of $10,000.00 from the disposition of other property claimed by you on your 1965 return resulting from an alleged destruction of chestnut trees on your farm in Siena, Italy, is disallowed because it has not been established that any deductible loss was sustained during the taxable year. 12 OPINION Petitioner contends that the loss of the chestnut trees constitutes a deductible loss incurred in his trade or business in his taxable year 1965 in the amount of $10,000. [1] Respondent contends that petitioner incurred no loss in the only year before us, 1965, that the chestnut trees were not part of a trade or business of petitioner, and that the salvage value of the trees exceeds any loss which petitioner might have incurred. *163 Petitioner filed his Federal income tax returns for his taxable years 1963, 1964, and 1965 on a calendar year basis, and there is no evidence that petitioner has ever filed an income tax return for a taxable year other than a calendar year. Respondent argues that this fact binds petitioner to report income and loss from his farming operations at the Spannocchia estate on a calendar year basis, citing O.D. 941, 4 C.B. 71 (1921) and Gill v. United States, 258 F. 2d 553 (C.A. 5, 1958). Respondent further asserts that the chestnut trees which petitioner claims as a loss for his taxable year 1965 actually 13 died before January 1, 1965 so that petitioner incurred no loss in the only year before this Court, 1965. [2]
Regardless of what might be said for the merits of respondent's position that a sole proprietorship must report income on a calendar year basis when the proprietor reports *164 his income from other sources on a calendar year basis, petitioner in this case reported the result of his entire operation of the Spannocchia estate by including the results of the fiscal year ended January 31, 1965 in his calendar year 1965 income tax return as he had done for many years prior to 1965 and respondent did not determine in his notice of deficiency that any change should be made in his reporting or allege in his answer that petitioner improperly reported the results of the operation of Spannocchia for its fiscal year 1965 in his calendar year 1965 return. Therefore in this case the issue as to whether petitioner should have reported his operations of Spannocchia on a calendar year basis is not properly before us. To whatever extent petitioner sustained a business loss from the loss of the chestnut trees in the fiscal year 1965 of the Spannocchia operation, this loss is a part of that operation to be included in the same fiscal year as the balance of the operation. 14 Respondent also contends in his brief that the death of the chestnut trees was not a loss incurred in a trade or business as contemplated by section 165(c) (1) of the Internal Revenue Code *165 of 1954. [3]Section 1.165-6(a), Income Tax Regs. states that "Except as otherwise provided in this section, any loss incurred in the operation of a farm as a trade or business shall be allowed as a deduction under section 165(a) * * *." Respondent contends that petitioner's estate in Italy was not a trade or business because since 1948 the farm has been unprofitable, that petitioner had not the slightest hope of a profit and that his retention of the estate is for sentimental rather than economic reasons. Again it should be pointed out that petitioner included the results of his operation of Spannocchia for its fiscal year 1965 in his calendar year 1965 income tax return as a business operation as he had done for many years and respondent in his notice of deficiency made no determination that this treatment of Spannocchia as a business operation was erroneous and made no allegation to this effect in his answer.In his opening statement at the trial, respondent's counsel stated as follows: A deduction of the loss was allowed [sic ] because the petitioners have failed to establish the basis of the property and how much of that basis was allocable to the chestnut trees. It has not *166 been established 15 that the farm in Italy was a trade or business, and even if it was considered a trade or business, that the chestnut trees were used in conjunction with the operation of said farm, neither has it been established that the chestnut trees died during the taxable year or that they died from anything other than old age. ater, when questioned as to this statement by the Court, respondent's counsel replied "* * * they haven't had a profitable year since World War II, and there is some question as to whether there is a business of a farm at all or whether it is more or less a hobby." In spite of this colloquy respondent never amended his answer or requested to amend his answer to allege that the operation of Spannocchia which petitioner had treated on his return as a business operation and which treatment respondent had not questioned was not a business operation. In this state of the record we do not consider any question properly before us as to whether Spannocchia was a business operation. Respondent also contends that there was in fact no loss resulting from the death of the chestnut trees *167 because "the trees were so old that they had no value other than salvage value, which the petitioner could have obtained regardless of whether the trees were alive or dead." The evidence does not support this contention of respondent. The chestnut trees had value in that they provided a food source for selected pigs on the Spannocchia estate. Although the trees were old, they still had many years of remaining useful life if they had not been killed by the blight. 16 The record shows that the chestnut trees on the estate have no salvage value because the combination of age and the blight has caused the wood to deteriorate making it unsuitable for burning, charcoal production, or other purposes. The evidence presented by respondent to the effect that the heartwood of a blight infested chestnut tree is as healthy as a non-infected tree is limited to relatively younger trees than petitioner's and respondent in his brief in effect so concedes. In our view, petitioner has shown that the dead chestnut trees have no value by showing that he attempted to find some economic use for the dead trees but was entirely unsuccessful. Respondent's final contention is that if petitioner *168 incurred a deductible loss in 1965 it was, without considering the salvage value of the chestnut trees, less than $10. Petitioner claims that the loss was in the amount of $10,000. The amount of loss allowable as a deduction under section 165(a) is the lesser of the adjusted basis of the property lost or the actual diminution in value of the property as a result of the loss. In this case it is apparent that the adjusted basis of the chestnut trees is less than their value at the time of their loss. It is difficult from the record to determine this basis, but in our view petitioner's basis in the trees can be determined at least approximately from the evidence of record. Petitioner inherited a one-third interest in Spannocchia upon the death of his father in 1942, subject to an income interest held by his mother. A partition of the property was held in 17 1954 and petitioner's sister Giovanna's interest in Spannocchia was physically separated and sold. In 1962, petitioner received from his sister Federica her interest in Spannocchia in exchange for petitioner's interest in a commercial building in Florence. Petitioner in his brief treats this exchange as if his basis *169 in his sister's interest in Spannocchia which he received in the exchange is the same as her inherited basis and respondent does not object to this method of determining petitioner's basis but merely to the amount petitioner claims as the basis at the time of the inheritance. The basis of property in the hands of a person acquiring the property from a decedent is the fair market value of the property at the date of the decedent's death. Section 1014. Respondent and petitioner agree that the fair market value of the entire estate of Spannocchia on May 1, 1942, the date of petitioner's father's death, was 4,314,000 lira. The parties disagree as to the proper conversion rate to dollars to be applied to the lira value. Petitioner asserts that the "official" exchange rate of 19.1 lira to one dollar is the rate to be applied whereas respondent submits that the correct rate to apply is the "free rate" or black market rate of 800 lira to the dollar. Many cases before this court have considered the issue of exchange rates in the context of blocked currency. In most of these cases the Commissioner asserted deficiencies based upon the official rate of exchange. In Marko Durovic, 54 T.C. 1364 (1970) *170 on appeal (C.A. 7, July 7, 1972) respondent urged that the commercial rate of exchange rather than the official rate should be used in converting foreign 18 expenditures into dollars. In agreeing with respondent we stated at p. 1389: Explicit in many of the blockage cases cited above is the fundamental consideration that United States taxation is "based on the value of property measured in terms of United States dollars." Estate of Jan Willem Nienhuys, supra at 1163. [17 T.C. 1149 (1952)] It is similarly evident from a reading of other foreign exchange cases that where gain or loss must be computed, it is the actual cost of the investment in terms of the number of dollars needed ( Willard Helburn, Inc., 20 T.C. 740 (1953)), which establishes basis, and the obtainable dollar equivalent of the currency received ( Edmond Weil, Inc. v. Commissioner, 150 F. 2d 950 (C.A. 2, 1945), affirming a Memorandum Opinion of this Court) which determines return. See also James A. Wheatley, 8 B.T.A. 1246, 1249 (1927). [footnote omitted]
The inescapable conclusion we draw from these cases is that taxation of international currency transactions *171 is a pragmatic endeavor. In almost all instances the courts, either in converting the value of property into dollars or in determining the dollar equivalent of gain or loss, have attempted to employ a rule of reason which reflects actual dollar worth in terms of salient market conditions. After all, "Taxation is a practical matter," [footnote omitted] and should, therefore, attempt to capture the realities of the situation in question. We believe that employment of the commercial rate of exchange permits this result since it is the commercial rate which actually determines the number of dollars which reasonable businessmen dealing at arm's length will be willing to pay for a commodity at a given time. * * * In our view petitioner's oun actions during the war years require us to reject the official rate of exchange in determining the value of Spannocchia in dollars on May 1, 1942. Petitioner testified that he would return checks drawn on American banks rather than cash them at the artificially low official exchange rates. When in need of money, he would sell livestock. Petitioner himself testified to the existence of a 19 "black market" exchange rate that reached as *172 high as 800 lira to the dollar. Immediately following the end of the war the exchange rate was about 600 lira to the dollar and remained around that level for a number of years. Petitioner implies that the valuation of the estate is somehow tied to the lira-dollar exchange rate. This assertion lacks logic. As of May 1, 1942, with the United States and Italy at war, the value of the estate of Spannocchia in United States dollars would be low even though this value in dollars might have increased following the war when there existed a relatively stable relationship between the lira and the dollar. The basis-rules in section 1014 require us to find that low wartime value of Spannocchia as the basis of petitioner's interest. Accordingly, we find that the value of Spannocchia on May 1, 1942 was $6,000. Petitioner and his two sisters inherited their interest in Spannocchia subject to the interest of their mother. Respondent asserts that in the absence of expert testimony to the contrary, we should assume that petitioner's mother's interest is equivalent to a life estate under Anglo-American common law. Petitioner testified that his mother's interest was only in 10 percent of the *173 profit, if there is a profit. On the other hand, a certificate with respect to the purchase by petitioner of his sister's interest in Spannocchia in 20 1062 indicates the mother's interest is "one-third of one-half of the income from the estate." [4]
In George Simenon, 44 T.C. 820, 835 (1965), we stated: * * *The rule relating to establishing a matter of foreign law is that judicial notice by a court cannot be taken of foreign law, as opposed to local law, the laws of the United States and general matters of domestic law, to which the concept of judicial notice extends. * * * A question of foreign law is a question of fact to be provided by the party having the burden of proof. * * * Clearly, petitioner has not met this burden of proof. Respondent argues that we should accept his position that petitioner's mother had a life estate in Spannocchia and apply the actuarial tables found in section 20.2031-9, Estate Tax Regs. *174 , and explained in section 20.2031-7 to determine the value of petitioner's mother's life estate. Respondent in his brief states that "The value of a life interest of a 72-year-old woman is equal to approximately 25 percent of the total value." Petitioner's mother was 50 years old when she received her life estate in Spannocchia and was approximately 72 years old in 1965. If we accept respondent's reduction of the value by 25 percent which would reduce the value as of 1965 when the loss of the trees occurred, the basis of the interest of all three children in the estate would 21 be $4,500. We do not determine whether the reduction of the value of the estate by 25 percent for the widow's interest is proper but rather accept it as in the nature of a concession by respondent. Petitioner's basis in Spannocchia is the sum of his basis of the interest acquired upon the death of his father, $1,500 plus his basis in the interest acquired from his sister, Federica. Petitioner in his argument assumed that because of the exchange with his sister, he took her basis in the Spannocchia estate. In fact, if the exchange should have been treated as a taxable exchange, petitioner should *175 have reported the gain he received of the difference, if any, in the fair market value of the interest he received in the estate and his basis in the office building. If the transaction was an exchange of property of like kind on which gain or loss is not recognized, petitioner's basis in the interest acquired from his sister would be his basis in the office building. However, since respondent did not object to petitioner's treatment of his basis in Spannocchia as being his basis by inheritance plus his sister's basis by inheritance, we assume that in effect the parties agree that petitioner's basis in the office building was the same as his sister's basis in her interest in Spannocchia and gain was not recognized on the exchange. Accordingly, we find that following the exchange in 1962, petitioner's basis in his interest in Spannocchia acquired from his sister was $1,500 and his total basis in Spannocchia in 1965 was $3,000. 22 Petitioner's basis in the estate of Spannocchia must be allocated among the various productive properties and buildings.Petitioner testified that 20 percent of the value of the Spannocchia estate was attributable to the chestnut groves. Respondent *176 contends that not more than 2 1/2 percent is so attributable. We agree with petitioner. In our view the relationship between the demand for the various crops and products produced at Spannocchia and reasonable forecasts which could be made in 1942 that charcoal demand would decline and that tenant farming would decline as it had in other parts of the world, leads to the conclusion that pig production was an important element in the economy of the Spannocchia estate, especially the production of chestnut-fed pigs. We conclude that the value of chestnut trees constituted 20 percent of the value of Spannocchia in 1942. It follows that petitioner's basis in the entire chestnut groves on his property is $600. The testimony of petitioner and his financial records show that 90 percent of the chestnut trees which were living in 1962 were destroyed in the fiscal years ended January 31, 1963, 1964, 1965, and 1966. About one-third of those destroyed were killed in the fiscal year ended January 31, 1965. Therefore, the basis of the trees which petitioner lost by disease in 1965 is $180 and petitioner is entitled to deduct only $180 of the $10,000 loss he claimed in 1965 because of the *177 death of the trees. 23 Respondent by proper pleadings has asked that we redetermine the deficiency of petitioner to be in the amount determined by him in his statutory notice of deficiency and in an additional amount of $553.64, representing the income tax owed on the amount of $1,058.23 which was not reported in petitioner's Federal income tax return for 1965. The omitted income was received by petitioner from the Spannocchia hunting reserve. Respondent has presented sufficient evidence to establish that petitioner did receive the income and has met his burden of proof. We, therefore, hold that petitioner's income for 1965 as reported should be increased by the $1,058.23 petitioner received from the Spannocchia hunting reserve. Decision will be entered under Rule 50. Footnotes
1. Petitioner in his petition alleged as an alternative that the loss was a casualty loss but has apparently abandoned his contention that the loss constituted a casualty loss since this contention is not mentioned in petitioner's brief. We therefore do not consider that any issue is now before us as to a casualty loss. However, we do note that the United States Court of Appeals for the Sixth Circuit, to which an appeal in this case would lie, has held that the destruction of trees by disease is not a casualty within the meaning of sec. 165(c)(3), I.R.C. 1954. Burns v. United States, 284 F. 2d 436↩ (C.A. 6, 1960). 2. Actually the record shows that trees continued to die throughout the fiscal year ended January 31, 1966 used by Spannocchia but the loss claimed by petitioner on his 1965 return was for the trees that died in the fiscal year of Spannocchia ended January 31, 1965. ↩
3. All references are to the Internal Revenue Code of 1954. ↩
4. It is not clear whether this reference is to the widow's receiving one-sixth of the income or, on the assumption the land is cultivated by sharecroppers, refers to the widow's receiving one-third of the landlord's share of the income. ↩