SANFORD A. BERMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
BERMAN v. COMMISSIONER
Docket No. 14875-79
United States Tax Court
T.C. Memo 1983-214; 1983 Tax Ct. Memo LEXIS 576; 45 T.C.M. (CCH) 1357; T.C.M. (RIA) 83214; April 19, 1983. Sanford A. Berman, pro se. Robert A. Miller, for the respondent. WILBUR
MEMORANDUM *577 FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined a deficiency in the Federal income tax of petitioner Sanford A. Berman of $5,886 for the year 1975. The issues for our decision are (1) whether petitioner is entitled to deduct the amount of money he invested in shares of now worthless stock as a theft loss under section 165(c)(3); [1] (2) whether petitioner is entitled to a bad debt deduction of $865; and (3) whether petitioner must recognize the full proceeds from the sale of his apartment in Spain in 1975 notwithstanding his inability to exchange some of those proceeds into U.S. dollars. FINDINGS OF FACT Some of the facts have been stipulated and those facts are so found. The stipulation of facts and the exhibits attached thereto are incorporated by this reference. Petitioner Sanford A. Berman is a psychologist employed at the Spring Grove State Hospital in Catonsville, Maryland. Petitioner lived in Catonsville when he filed the petition in this case and when he timely filed his 1975 Federal income tax *578 return and his 1975 amended return. In 1968 petitioner met Richard Davis who owned shares in a Canadian company called International Scanning Devices, Inc., (ISD). [2] Relying on information received from Mr. Davis and a magazine article describing the company, petitioner decided to purchase 200 shares of common stock; in February 1969 he bought an additional 300 shares from Mr. Davis. Mr. Davis did not tell petitioner that resale of the securities was restricted under the Securities Act of 1933 [3] Dr. Berman purchased 1,000 shares from a stockbroker in June 1972. In February 1973 petitioner bought another 2,422 shares of treasury stock directly from ISD at the request of the company president Louis P. Mirando. Dr. Berman invested a total of $27,620 in ISD between 1968 and 1973, and ultimately owned 4,000 shares. [4] He realized that the investment was speculative, yet until March 1973 was satisfied with the company. *579 In March 1973 Dr. Berman became suspicious about ISD and its management. He believed he had received misleading and deceptive information from Louis Mirando when he purchased stock in February, and attempted to reverse that transaction. Mirando denied Berman's accusations and refused to reverse the sale. During 1973, 1974, and 1975 petitioner wrote to the SEC and to various American and Canadian lawyers about ISD in hopes of recovering his investment. He eventually learned that the company had ceased operations in August 1974, and that receivers had been appointed by a Federal District Judge in November 1974. By 1975 there was no doubt but that Mirando and ISD had no assets with which to satisfy any judgment petitioner might obtain. The record shows that Louis P. Mirando and ISD were the subject of various actions by the SEC. In June 1970 over-the-counter trading was stopped for 2 weeks when the Commission found that public information about ISD was insufficient. The press report expressed doubt about the accuracy of ISD's 1969 financial report, and said that certain progress statements published by the company were incomplete and inaccurate. Securities Exchange Act of *580 1934, Release No. 8903, June 15, 1970. The other suits involved the sale of unregistered securities. Mirando was not charged with fraud in the sale of ISD securities. [5]
Petitioner received many shareholder letters between 1968 and 1974. The letters described contract negotiations, licensing agreements, technical progress, and other information of interest to shareholders. No mention was ever made of financial difficulties, and petitioner never received an explanation *581 of ISD's ultimate downfall. None of the statements made in these shareholder letters were shown to be false, nor did petitioner demonstrate precisely how he was misled by them or how he had relied on them.
In February 1973 Louis Mirando agreed to sell 2,422 shares of ISD treasury stock to petitioner at 70 percent of the market price. Mirando indicated that time was of the essence so petitioner's payment was based on an estimate of market price. Once quotations were available for the date of sale, petitioner realized that he had overpaid by $865. He requested a refund. Mirando eventually acknowledged the debt, but never paid it. In October 1970 Dr. Berman purchased a one-bedroom condominium, "Los Cisnes No. 94" in Malaga, Spain for $9,785. In January 1975 he sold the apartment for $14,184; he netted $12,766 after payment of a realtor's commission. [6] Petitioner actually received $4,524 of the purchase price in 1975; [7] the balance was held by petitioner's real estate agent in Spain. [8] Dr. Berman made many attempts to get this money out of Spain; he was unsuccessful because of the foreign exchange regulations in force. He finally exchanged the pesetas in 1976. *582 Petitioner reported no long-term capital gain from the sale of his apartment in 1975, but did offer this statement on Schedule D: For information only: * * * On 7/1/75 rec'd. $2.706 and on 7/15/75 rec'd. $1,818 as partial payments. The remainder, 466,000 Pesetas, or approx. $7,000--is in Spain. Due to exchange control laws, I can not get the money out of Spain, can not use it, and do not have constructive receipt of it. Petitioner never filed a "Report of Deferrable Foreign Income" with his returns. OPINION The first issue for our decision is whether petitioner Sanford A. Berman is entitled to deduct the amount of money he invested in International Scanning Devices, Inc., as a theft loss in 1975. Petitioner became an ISD shareholder in 1968, and by 1973 owned some 4,000 shares. Some of his stock was purchased from other shareholders, some over-the-counter, and some directly from the company president Louis P. Mirando. Petitioner relied on positive reports from the company and from its officers in deciding to invest in IDS. Dr. Berman became disenchanted in 1973, began investigating the company, and attempted to recoup some of his investment. He was unsuccessful, *583 and by 1975 gave up hopes of recovery: ISD was in bankruptcy and had no assets from which a judgment could be satisfied. Petitioner contends that he is entitled to a theft loss deduction under section 165(c)(3) for the money he invested in ISD stock. He says that Mirando's "modus operandi" was fraudulent, and that the money he invested was thus stolen from him. Respondent argues that Dr. Berman has not established that a theft took place, and therefore is not entitled to a deduction. We agree with respondent. Section 165(c)(3)[9] allows individuals to deduct losses arising from theft. This Court has sustained such deductions where the theft consisted of false representations which induced the taxpayer to part with money or property. Nichols v. Commissioner,43 T.C. 842 (1965); Monteleone v. Commissioner,34 T.C. 688 (1960). Whether or not the false representations amount to theft depends on local law. Edwards v. Bromberg,232 F.2d 107 (5th Cir. 1956); Paine v. Commissioner,63 T.C. 736 (1975), affd. without published *584 opinion 523 F.2d 1053 (5th Cir. 1975); Muncie v. Commissioner,18 T.C. 849 (1952). Under Maryland law, one who obtains something of value from another by use of a false pretense is guilty of a misdemeanor. Md. Ann. Code art. 27, sec. 140 (1967). Three elements must be shown: (1) the false representation of a past or existing fact; (2) that was made with the intent to *585 defraud; and (3) that was actually relied upon by the victim. Waye v. State,231 Md. 510, 191 A.2d 428 (Md. Ct. App. 1963); Lockard v. State,3 Md. App. 580, 240 A.2d 312 (Ct. Spec. App. 1968). Petitioner must prove these elements in order to satisfy the burden of proof imposed by Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioner has not met this burden. First, he points to no specific misrepresentation of fact in the information he received from ISD. Cursory examination reveals that some statements in the ISD letters may have been exaggerations, but none were shown to be false. Second, petitioner offers no evidence of fraudulent intent. Mirando may have glossed over problems in writing or talking to Dr. Berman, but petitioner has not shown that Mirando intended to defraud him. [10] Finally, petitioner demonstrates no actual reliance on the alleged false representations. The generally optimistic reports may have contributed to Dr. Berman's decision to hold his ISD stock, but he has not shown that he would not have purchased ISD shares or that he would have sold those he held, had he not received these letters. We agree *586 with petitioner that Mirando was not a model of integrity, and that his letters were not always candid. [11] We agree that one could fairly surmise from all the evidence that there was more--or more aptly, less-happening at ISD than met the eye. But the tax law requires more than intuitions and bad feelings; it requires proof of acts constituting a theft under state law. For the most part the record simply suggests a poorly informed investor who invested in a speculative stock. No theft has been shown here under state law, and petitioner's deduction must therefore be disallowed. *587 The second issue for our decision involves the propriety of petitioner's $865 bad debt deduction. Petitioner's oral and documentary evidence establishes the existence of the debt; his testimony convinces us that he never received payment from ISD; and other letters and testimony show that the debt became worthless in 1975 with the bankruptcy of the corporation. These facts satisfy the requirements of section 166(d), and petitioner's deduction is therefore allowed. The third issue for our decision involves the correct treatment of the gain realized upon the sale of petitioner's condominium on the Costa del Sol. Petitioner divides the proceeds into two portions: that amount received in U.S. dollars in 1975 and that amount which, due to foreign exchange restrictions, remained in Spain until 1976. He contends that only the first portion is income in 1975 and since it is less than his basis, he has no reportable gain. Respondent maintains that despite petitioner's inability to exchange pesetas for dollars in 1975, the money was at petitioner's disposal during that year so was taxable to him. We agree with respondent. Petitioner is a cash basis taxpayer and must, therefore, *588 report any gain from the sale of property in the year in which the payment is either actually or constructively received. Section 1.446-1(c)(i), Income Tax Rags. Income is constructively received by a taxpayer when "it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time * * *." Section 1.451-2(a), Income Tax Regs. If, however, the taxpayer's control is subject to "substantial limitations or restrictions," there is no constructive receipt. Section 1.451-2(a), Income Tax Regs.
Evidence submitted by the petitioner shows unequivocally that the entire sales price was either actually re-received by him or credited to his account in 1975. He argues that the foreign exchange rules substantially restricted his control within the meaning of the regulation just quoted. In light of numerous cases decided by this and other courts we cannot agree. Income subject to foreign exchange regulations, termed "blocked income," was the subject of various suits in the 1930's and 1940's. the cases *589 hold that if the currency is at the taxpayer's disposal in the foreign country, it must be reported in the year received. Cooper v. Commissioner,15 T.C. 757 (1950); Eder v. Commissioner,138 F.2d 27 (2d Cir. 1943); cf. Weil,Inc. v. Commissioner,150 F.2d 950 (2d Cir. 1945), affg. a Memorandum Opinion of this Court; Credit & Investment Corp. v. Commissioner,47 B.T.A. 673 (1942). The crucial factors in these cases were (1) the taxpayer's ability to use the blocked funds locally, and (2) the existence of a market for the currency. [12] Here it is clear that petitioner could spend the money locally in Spain and that is enough to require taxation of any gain in 1975. We note that in Eder,supra at 28, the court specifically refuted the position Dr. Berman takes here: "We do not agree with taxpayer's argument that inability to expend income in the United States, * * * necessarily precludes taxability." Petitioner thus constructively received the full sales price in 1975 and must include all gain from the sale in income for that year. *590 The dearth of cases in recent years stems in part, from the publication of Mimeograph 6475 in 1950, superseded by Rev. Rul. 74-351, 1974-2 C.B. 144. [13] This publication implicitly recognizes the hardship faced by taxpayers who cannot repatriate their income, and gives them the privilege of deferring recognition of the blocked income until it can be freely exchanged into dollars. The Commissioner requires those wishing to avail themselves of the deferral to file a "Report of Deferrable Foreign Income, Pursuant to Rev. Rul. 74-351." In this information return the taxpayer must report the amount of deferrable income; agree to report it when it ceases to be deferrable; and waive the right to claim that any part of it was includable in earlier years. Rev. Rul. 74-351, supra.
On brief petitioner asks us to treat the explanation in his Form 1040 as an election to defer. The deferral is a privilege conditioned on adherence to the prescribed procedures. Petitioner has not complied with these procedures and he must report the gain in 1975. Decision *591 will be entered under Rule 155.
Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue.↩
2. ISD was a Delaware corporation whose principal place of business was in Fort Erie, Canada. The company was primarily involved in research and development of an electroluminescent device which could be used in signs and in a "flat" t.v. See SEC v. International Scanning Devices, Inc., et al.,↩ an unreported case (W.D.N.Y. 1977), Fed. Sec. L. Rep. (CCH) par. 96,147. 3. The shares petitioner purchased from Mr. Davis were not registered with the SEC. Unless and until ISD filed a registration statement, petitioner was required to comply with SEC rule 144 before selling his shares. ↩
4. The numbers of shares do not add up to 4000 due to a stock split in 1969.↩
5. In SEC v. International Scanning Devices, Inc., et al.,supra, Mirando, ISD, and the officers and agents of ISD were permanently enjoined from selling unregistered ISD indentures, and from violating sec. 13(a) of the Securities Exchange Act of 1934, and rules 13a-11 and 13a-13 thereunder. Mirando was involved with another company during these years and was found guilty of violating the antifraud provisions--sec. 17(a) of the Securities Act of 1933, 15 U.S.C. sec. 77q(a) and sec. 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. sec. 78j(b)--in the sale of its securities. SEC v. International Scanning Devices, Inc.,et al.,supra.↩
6. The purchase and sales price were 680,000 and 800,000 pesetas, respectively. In 1970 the exchange rate was 69.49 pesetas to the dollar; by 1975 it had dropped to 56.40. ↩
7. The contract of sale provided that 200,000 pesetas would be paid at the closing, and the balance before the end of March 1975. Three hundred fifty thousand of the final 600,000 was to be paid in pesetas, and the other 250,000 in sterling pounds. ↩
8. This money was available to petitioner in Spain by April 29, 1975 at the latest.↩
9. The pertinent provisions of sec. 165 are as follows: SEC. 165. LOSSES. (a) GENERAL RULE.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (c) LIMITATION ON LOSSES OF INDIVIDUALS.--In the case of an individual, the deduction under subsection (a) shall be limited to-- (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. * * *↩
10. Petitioner does not accuse Mr. Davis, from whom he made his initial purchase, of fraud; nor does he allege any misconduct by the brokerage firm with whom he dealt in 1972. Thus the only seller who could have obtained petitioner's money by false pretenses is Louis Mirando. ↩
11. The SEC's findings of June 1970 temporarily stopping trading in ISD support this view. Another example of Mirando's somewhat misleading prose, found in a shareholder letter of November 1973, is the statement that "We are not showing a profit this year because we have the tax credit from our eight years of research * * * and the half million dollar tax loss carry forward * * *."↩
12. In International Mortgage and Investment Corp. v. Commissioner,36 B.T.A. 187 (1937), a case petitioner relies on, the Court held that the taxpayer need not include the blocked income because the gain "was not measurable in terms of dollars." This is merely another way of stating the second requirement noted above, and does not help petitioner's case. See Cooper v. Commissioner,15 T.C. 757, 765↩ (1950).
13. Rev. rul. 74-351 has been modified by Rev. Rul. 81-290, 1981-2 C.B. 108↩.