CHARLES ALEXANDER McKEE AND MARY ANN McKEE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McKee v. Commissioner
Docket No. 23271-83.
United States Tax Court
T.C. Memo 1985-574; 1985 Tax Ct. Memo LEXIS 52; 50 T.C.M. (CCH) 1473; T.C.M. (RIA) 85574; November 26, 1985. *52 Petitioner-husband accepted employment in Guatemala for a period of 24 months. Petitioners entered Guatemala on April 29, 1980. A state of civil unrest in the vicinity of employment was evident. Petitioners fled Guatemala on April 8, 1981. Held: Petitioners are not entitled to exclude certain foreign earned income because the foreign residence or presence provisions of sec. 911(a) I.R.C. 1954 may not be waived under sec. 913(j)(4) I.R.C. 1954 except where the Secretary of the Treasury, after consultation with the Secretary of State, has determined that war, civil unrest, or similar adverse conditions precluded the normal conduct of business. Held further: Petitioners must recognize certain payments denominated in Guatemalan currency. Charles Alexander McKee and Mary Ann McKee, pro se. Hugh Spall, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined a deficiency of $7,362.55 in petitioners' joint 1980 Federal income tax. The issues for decision are (1) whether petitioners may exclude certain foreign earned income under section 911(a); [1] and (2) whether petitioners must include within gross income $10,400 received as a cost *53 of living allowance during the foreign residency period. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Peshastin, Washington when they filed their petition in this case. Petitioner Charles McKee ("Charles") was a mechanical engineer. Petitioner Mary McKee ("Mary") was a homemaker. In January of 1980, Charles accepted employment with the International Engineering Company, Inc. ("IECO") as resident mechanical engineer at the Pueblo Viejo-Quixal Hydroelectric Project ("the Project") in Guatemala. The employment contract provided a fixed employment term of 24 months commencing from the date of arrival at the Project. Petitioners entered Guatemala on April 29, 1980. The IECO employment contract provided a fixed monthly salary payable in United States dollars. Charles directed IECO to deposit his monthly salary to petitioners' *54 joint bank account with a bank in Wenatchee, Washington. The IECO employment contract further provided a monthly "local allowance" or cost of living allowance payable in "the local currency equivalent amount of $1,300." Charles received eight monthly local allowance payments during 1980, each in the amount of 1300 Guatemalan quetzales. Consequently, Charles received 10,400 Guatemalan quetzales during 1980. IECO characterized the monthly local allowance payments as wages on Charles' 1980 Form W-2 in the amount of $10,400. Petitioners reported such amount as wages on their 1980 tax return. IECO applied the official Guatemalan quetzal to United States dollar exchange rate of one quetzal to one dollar to determine Charles' monthly local allowance equivalent of $1,300. The purpose of the local allowance was to provide IECO employees compensation in local currency for the purchase of incountry necessities. Petitioners expended Guatemalan quetzales for the maintenance, fuel, and other costs related to their private aircraft. Petitioners maintained the aircraft at a nearby airfield to ensure emergency transportation from in equivalent Guatemalan quetzales to a Guatemalan moving company *55 which was engaged to transport petitioners' furniture and automobile to the United States. Petitioners' Guatemalan rent was paid in United States dollars to an American who refused to accept quetzales. In April of 1980, Guatemala imposed currency exchange controls which required that any individual or company which received foreign currency had to sell such foreign currency to the Central Bank of Guatemala or other authorized commercial bank. The Project was located near Coban, Guatemala which was approximately 150 miles north of Guatemala City. IECO, a Swiss company, and a German company formed a consortium to design and develop the Project. The consortium maintained a housing compound at the Project for its employees and their dependents. The compound housing was not provided free of cost. The compound was guarded at all times by Guatemalan military forces to ensure safety. The compound accommodated all of the Project's employees and their dependents, except petitioners. Petitioners were not able to secure housing within the compound due to capacity constraints. Petitioners located alternative housing some 26 miles from the Project, well beyond the protection of the compound. *56 This unfortunate occurrence was unforeseen at the time Charles accepted employment in Guatemala and exposed petitioners to a grave and perilous environment. During late 1980, an increased presence of Guatemalan military forces in the vicinity of the project was noted. Incidents involving rebel guerrilla forces was also evident in this area. While petitioners resided in Guatemala, an American engineer employed at a different job site was killed in nearby Peten. In March of 1981, petitioners' physician was assassinated by machine gun fire near Guatemala City in view of the physician's three children. One of the physician's children was wounded in the attack. Petitioners often heard the sounds of military engagements during the night. The several events above referred to established that a state of civil unrest existed in the vicinity of the Project. Petitioners filed Guatemala on April 8, 1981. In August of 1981, the U.S. State Department issued a travel advisory which recommended that U.S. citizens not travel to Guatemala. In March of 1982, a retired American resident of Guatemala, who had been petitioners' neighbor and friend during their period of residency in Guatemala, was *57 killed by machine gun fire while in his home. OPINION Foreign Earned Income Exclusion
Section 61 defines gross income as worldwide income from whatever source derived except as otherwise provided within Subtitle A - Income Taxes. Section 911(a) provides that an individual who satisfies the foreign residence or presence requirements of section 913(a)[2] *58 and who, because of foreign employment, resides in a "camp" located within a "hardship area" shall, unless such individual elects otherwise, exclude from income an amount determined under section 911(c) if such income is received from sources within a foreign country and constitutes earned income attributable to services performed during the requisite period of foreign residency. The foreign residence or presence provisions applicable to the section 911 foreign earned income exclusion or the section 913 deduction for certain foreign expenses may be waived under the rigid requirements of section 913(j)(4). [3] *60 Congress enacted the waiver provisions of section 913(j)(4) to alleviate the unexpected tax consequences of Americans who were employed in Iran with the expectation of meeting the foreign residence or presence requirements but were forced to return to the United States prior to the time that those requirements were satisfied due to severe civil unrest. S. Rept. 96-1031, 1980-2 C.B. 730, 732. Section 913(j)(4) embodies three prerequisite factors to effectuate a waiver of the residence or presence provisions. Section 913(j)(4)(A), (B), (C). We have determined that petitioners have not satisfied the prerequisite factor *59 of section 913(j)(4)(B), which requires that the Secretary of the Treasury consult with the Secretary of State or his delegate to determine the foreign countries where the normal conduct of business is precluded because of war, civil unrest, or similar adverse conditions. On March 20, 1981, the list of countries so designated was issued. Rev. Proc. 81-23, 1981-1 C.B. 693. Guatemala was not designated as country where war, civil unrest, or similar adverse conditions precluded the normal conduct of business. [4] Petitioners fled Guatemala on April 8, 1981. Consequently, when petitioners left Guatemala, a required determination mandated by section 913(j)(4)(B) had not been made. It is well settled that exclusions or deductions are a matter of legislative grace and must be strictly construed. Independent Cooperative Milk Producers Ass'n. v. Commissioner,76 T.C. 1001, 1014 (1981). Section 913(j)(4) mandates a unique procedure which requires that the Secretary of the Treasury after consultation with the Secretary of State, designate foreign countries which qualify for the waiver of residence *61 or presence provisions due to war, civil unrest, or similar adverse conditions. In the absence of such designation as to Guatemala, [5] *62 petitioners do not as a matter of law satisfy the requirement of section 913(j)(4)(B) and must include earned income attributable to services performed during their residency in Guatemala.[6]Section 913(j)(4) mandates rigid statutory compliance with the unique provisions enacted by Congress. We sympathize with petitioners' plight, however, we must apply the laws as enacted by Congress. See United States v. Mitchell,403 U.S. 190, 205 (1971). Here the applicable provisions are clearly written and obviate any need of judication given in their application. Cost of Living Payments
The IECO employment contract provided a "local allowance" or cost of living payment in an amount equal to "the local currency equivalent of $1,300" per month. During 1980, petitioners resided in Guatemala for eight months and received 1300 quetzales per month. IECO characterized the cost of living payments as additional wages on Charles' 1980 Form W-2 and determined the dollar value of the quetzal denominated payments at the official Guatemalan exchange rate of one quetzal to one dollar. Petitioners *63 contend that Guatemalan foreign exchange controls operated to exempt quetzal denominated income from United States taxation. Furthermore, petitioners argue that the official exchange rate was not the free market exchange rate. Respondent submits that Guatemalan foreign exchange controls did not operate to exempt quetzal denominated income. According to respondent, exchange controls prohibited only the removal of non-Guatemalan currency from the country, and, accordingly, petitioners must include quetzal denominated payments in gross income as such funds were available to spend in Guatemala and could be exchanged in the foreign exchange markets. We agree with respondent. It has long been settled that income subject to foreign exchange controls, termed "blocked income," is recognized by a cash basis taxpayer as gross income in the year of receipt if such income is available as disposable income within the foreign country and can be valued at a free market exchange rate in the United States. [7]Cooper v. Commissioner,15 T.C. 757 (1950); Eder v. Commissioner,138 F.2d 27 (2d Cir. 1943); cf. Weil, Inc. v. Commissioner,150 F.2d 950 (2d Cir. 1945), affg. a Memorandum Opinion of this *64 Court; Credit & Investment Corp. v. Commissioner,47 B.T.A. 673 (1942). [8] Here, petitioners clearly had the ability to use their quetzal denominated income in Guatemala and that fact is sufficient to require income recognition. Petitioners expended a substantial amount of quetzales to maintain their aircraft in Guatemala and to move their personal property to the United States. Petitioners, therefore, must recognize as gross income the quetzal denominated payments. The dollar value of quetzal denominated income is the free market rate of exchange in the United States. Cooper,supra at 765. Petitioners assert that the free market exchange rate in the United States was not the Guatemalan official exchange rate of one quetzal to one dollar. Petitioners introduced a bank memorandum from Seafirst Corporation dated October 4, 1984 to support their contention. The Seafirst Corporation bank memorandum indicated that the free market exchange rate in the United States at that date was one quetzal to 62 cents. However, the issue for decision here is the quetzal free market exchange rate in the United States during 1980. IECO applied the official Guatemalan exchange rate to determine the *65 local allowance equivalent of $1,300 and applied the official exchange rate to determine the value of the quetzal denominated income for tax purposes on Charles' Form W-2. Respondent's determination of value is presumptively correct, and petitioners bear the burden of disproving that determination. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). The Seafirst Corporation Bank memorandum dated October 4, 1984 is not relevant to our determination of the quetzal denominated income received during 1980. Consequently, petitioners have not demonstrated that the quetzal free market exchange rate in the United States during 1980 was not the official Guatemalan exchange rate. Petitioners' gross income must include the quetzal denominated income in the amount of $10,400.00. Based on the foregoing, Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue and all rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Sec. 913. Deduction for Certain Expenses of Living Abroad. (a) Allowance of Deduction. - In the case of an individual who is - (1) Bona Fide Resident of Foreign Country. - A citizen of the United States and who establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, or (2) Presence in Foreign Country for 17 Months. - A citizen or resident of the United States and who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, there shall be allowed as a deduction for such taxable year or for any taxable year which contains part of such period, the sum of the amounts set forth in subsection (b).↩
3. Sec. 913.- Deduction for Certain Expenses of Living Abroad. * * * (j) Other Definitions and Special Rules.- * * * (4) Waiver of Period of Stay in Foreign Country.- For purposes of paragraphs (1) and (2) of subsection (a), an individual who- (A) for any period is a bona fide resident of or is present in a foreign country, (B) leaves such foreign country after August 31, 1978- (i) during any period during which the Secretary determines, after consultation with the Secretary of State or his delegate, that individuals were required to leave such foreign country because of war, civil unrest, or similar adverse conditions in such foreign country which precluded the normal conduct of business by such individuals, and (ii) before meeting the requirements of such paragraphs (1) and (2), and (C) establishes to the satisfaction of the Secretary that he could reasonably have been expected to have met such requirements but for the conditions referred to in clause (i) of subparagraph (B), shall be treated as having met such requirements with respect to the period described in subparagraph (A) during which he was a bona fide resident or was present in the foreign country. ↩
4. We note that El Salvador and Nicaragua qualify for the waiver of residency period requirements. Rev. Proc. 81-23, 1981-1 C.B. 692↩.
5. The Committee Report indicates that situations where the State Department issues a travel advisory recommending that U.S. Citizens avoid travel to a country because of unsettled conditions ordinarily warrant designation by the Department of the Treasury that the residence or presence requirements be waived. S. Rept. 96-1031, 1980-2 C.B. 730, 732. In August of 1981, the Department of State issued a travel advisory as to Guatemala. However, Rev. Proc. 81-23, which was issued on March 20, 1981, has not been modified or amplified. 6. We note that in the notice of deficiency respondent denied an exclusion under sec. 911(a) because petitioners did not reside in a "camp" located in a "hardship area". Petitioners did not assign any error to this determination and this issue is deemed to be conceded. Rule 34(b)(4); Jarvis v. Commissioner,78 T.C. 646, 658 (1982). Although not argued in respondent's brief, this concession is dispositive of this issue irrespective of the waiver of residency period provisions of sec. 913(j)(4) because sec. 911(a) requires that such individual reside in a "camp" located within a "hardship area". Secs. 911(a)↩; 911(c)(1)(B); 911(c)(1)(C).
7. Berman v. Commissioner,T.C. Memo. 1983-214↩. 8. The dearth of recent decisions concerning blocked foreign income is due, in part, to the publication of Mimeograph 6475 in 1950, superseded by Rev. Rul. 74-351, 1974-2 C.B. 44, and modified by Rev. Rul. 81-290, 1981-2 C.B. 108↩.